UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| PUBLIC EMPLOYEES FOR | ) | |
| ENVIRONMENTAL RESPONSIBILITY and | ) | |
| TENNESSEE CLEAN WATER NETWORK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.:   3:18-CV-13-TAV-HBG |
| | ) | |
| CLAY BRIGHT, in his official capacity as | ) | |
| COMMISSIONER OF THE TENNESSEE | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

This civil action is before the Court following a three-day bench trial occurring on January 12–14, 2021 [Docs. 68–72, 76–78].  Because of the ongoing COVID-19 pandemic, and with the agreement of the parties, the Court conducted the bench trial via videoconference [Docs. 58, 62].

After giving careful consideration to the testimony of the witnesses [Doc. 71], the exhibits introduced at trial [Doc. 72], the transcripts of the proceedings [Docs. 76–78], the proposed findings of fact and conclusions of law [Docs. 84, 86], the post-trial briefs [Docs. 83, 85, 88, 89], and the applicable law, the Court herein makes its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a) ("In an action tried on the facts without a jury . . . , the court must find the facts specifically and state its conclusions of law separately.").  Before presenting its findings of fact and conclusions of

law, the Court will first set forth a short summary of the procedural history of this matter, as well as address two preliminary issues.

## I.    Procedural History

Plaintiffs Public Employees for Environmental Responsibility and Tennessee Clean Water Network seek declaratory and injunctive relief pursuant to 33 U.S.C. § 1365(a)(1) against defendant Clay Bright, in his official capacity as Commissioner of the Tennessee Department of Transportation ("TDOT" or "defendant") for violations of permits issued pursuant to 33 U.S.C. §§ 1341 and 1344 of the Clean Water Act, 33 U.S.C. § 1251, et seq. ("CWA") [Doc. 1].  The two permits at issue in the complaint are the § 401 Water Quality Certification No. 92-142 issued to TDOT by the Tennessee Department of Environment and Conservation ("TDEC") under 33 U.S.C. § 1341 (the "Certification") and the § 404 Permit No. 52,789 issued by the United States Army Corps of Engineers ("ACOE") under 33 U.S.C. § 1344 ("Permit") [Doc 1 at ¶ 2].  The Court granted defendant's motion to dismiss "to the extent that plaintiffs' complaint alleges that TDEC and the ACOE used improper procedures to modify defendant's Certification and Permit" and "to the extent that plaintiffs allege violations of defendant's § 404 Permit" [Doc. 36].  Plaintiffs were allowed to "proceed with their claims to the extent that they allege violations of defendant's § 401 Certification." [*Id.*].

At summary judgment, the Court found that plaintiffs' remaining claims raised three essential issues:

(1)   Whether TDEC's August 29, 1997 letters legally alter the [C]ertification's wetland mitigation acreage requirement, (2) whether

2

defendant complied with the [C]ertification to create a specified amount of wetland acres, and (3) whether defendant has complied with the [C]ertification requirements with respect to the land use restriction

[Doc. 54 at p. 7]. The Court denied both parties' motions for summary judgment with respect to the first two issues, and deferred ruling[1] on issue three, finding that while the third issue raised what "appear[ed] to present purely legal questions," the matter would proceed to a bench trial regardless to address the first two issues [*Id.* at pp. 19-20].

The parties' Pretrial Order identifies the following issues to be resolved at trial:

a. Was the § 401 [C]ertification modified in 1996 to expand the [C]ertification's wetland mitigation requirement to 3.268 acres?

b. Was the § 401 [C]ertification modified by the TDEC in 1997 to decrease the [C]ertification's wetland mitigation acreage requirement to 1.01 acres?

c. What acreage of wetlands was the TDOT required to construct in order to comply with the § 401 [C]ertification and/or the modified § 401 [C]ertification?

d. How many acres of wetlands mitigation area has TDOT actually constructed or otherwise caused to exist at the mitigation site?

e. Is the wetland area at the mitigation site in compliance with TDEC's water quality criteria?

f. Do the deed restrictions imposed by the Notice of Land Use Restrictions applicable to the mitigation area comply with the requirements of the § 401 [C]ertification and TDEC's regulations?

[Doc. 63 at ¶ 7].

---

[1] While the Court deferred ruling, the instant opinion resolves all remaining issues in this litigation. To the extent that no formal ruling was made as to summary judgment on the Notice of Land Use Restriction issue, the cross motions for summary judgment are now moot.

## II.    Jurisdiction

After the trial, defendant, in his post-trial brief [Doc. 83], challenged whether plaintiffs have presented any evidence to establish Article III standing to sue. Defendant first raised this issue in his motion to dismiss [Doc. 27]. In the absence of Article III standing, the Court would lack subject matter jurisdiction, and the case would necessarily be dismissed. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 793 (6th Cir. 2009).

As the Court set out in its Order addressing the motion to dismiss [Doc. 36], to establish Article III standing, a plaintiff must show:

> (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Wuliger*, 567 F.3d at 793 (quoting *Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 645 (6th Cir. 2004)). Moreover, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1997)).

4

Defendant disputes whether plaintiffs have successfully demonstrated that their members have suffered an injury-in-fact. Such an injury must consist of "an invasion of a legally-protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Environmental plaintiffs must show their own injury, rather than one to the environment. *Laidlaw*, 528 U.S. at 181. Injury-in-fact is adequately alleged for environmental plaintiffs "when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)) (internal quotations omitted).

At the motion to dismiss stage, plaintiffs' injury-in-fact need only be supported by general factual allegations. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (U.S. 1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (internal quotations omitted). This is in contrast to the summary judgment stage, where a "plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken as true." *Lujan*, 504 U.S. at 561 (internal citations and quotations omitted). "And at the final stage, those facts **(if controverted)** must be supported adequately by the evidence adduced at trial." *Lujan*, 504 U.S. at 561 (emphasis added, internal citations and quotations omitted).

The Court, in denying the motion to dismiss as to the issue of standing and jurisdiction, held that:

> [p]laintiffs have met their burden at this stage. Both declarations make clear that Mr. Stratford and Mr. Proios have recreational and aesthetic interest in Cherokee Lake, as they frequently go boating, Mr. Stratford goes birdwatching, and Mr. Proios lives on its shore and frequently collects water samples [Docs. 1-2, 1-3]. Furthermore, Mr. Stratford and Mr. Proios have alleged that defendant's actions have caused them concrete and particularized harms

[Doc. 36 at p. 12].

When defendant raised the issues of standing and jurisdiction in his post-trial brief [Doc. 83], the Court Ordered the parties to file supplemental briefs addressing those issues [Doc. 87]. Plaintiffs' supplemental brief [Doc. 88] points to the parties' agreed Pretrial Order [Doc. 63] as well as an email chain between counsel for plaintiffs and defendant [Doc. 88-1], arguing that plaintiffs' counsel believed that the issue of standing had been resolved, that defendant was not going to challenge standing, and thus there was no need to call Mr. Stratford and Mr. Proios at trial. Plaintiffs further argued that the Court should reopen evidence and allow plaintiffs to present evidence on the issue of standing. Defendant responded [Doc. 89], arguing that he did not stipulate to jurisdiction/standing, and arguing that jurisdiction can be challenged at any time.

The parties' agreed Pretrial Order states the following with respect to the subject of jurisdiction:

> Plaintiffs claim that the Tennessee Department of Transportation ("TDOT" or "Defendant") has failed to create wetlands near a widened section of State Routes 1 and 32 in Grainger County, Tennessee (the "mitigation site") in accordance with a certification granted to Defendant under section 401 of the

6

Clean Water Act ("CWA"). The widening resulted in the filling of approximately 0.92 acres of wetlands upstream of Cherokee Lake [Doc. 1; Doc. 36 at 1-2]. Plaintiffs bring their claim under the citizen suit provision of the CWA, 33 U.S.C. § 1365(a)(1). The Court has ruled that because the case stems from alleged violation of a federal statute, the Clean Water Act, it is a federal question within the bounds of 13 U.S.C. § 1331 [Doc. 36].

**The Court has ruled that Plaintiffs have standing.** Plaintiffs' members Mr. Stratford and Mr. Proios have recreational and aesthetic interests in Cherokee Lake [Docs. 1-2, 1-3; Doc. 36 at 12]. The Court determined the Plaintiffs' injury in fact need only be supported by general factual allegations. The Court granted the Defendant's Motion to Dismiss the allegations in the Complaint that alleges that TDEC and the ACOE used improper procedures to modify defendant's Certification and Permit. The Court also dismissed the Plaintiffs' alleged violations of Defendant's § 404 Permit [Doc. 36, at 32].

[Doc. 63 at ¶ 1 (emphasis added)]. A January 6, 2021, email from defense counsel to plaintiffs' counsel states:

**Standing is not an issue at trial.** The court has to decide at the outset if the plaintiffs have standing and the court has already ruled in the Plaintiffs favor. In fact the defendants aren't allowed to challenge the affidavit testimony, which is why we did not take the deposition. If you are presenting them as witnesses, we will file a motion to exclude them.

[Doc. 88-1 at p. 3 (emphasis added)].

Defendant is correct that plaintiffs did not present any evidence on the question of standing at trial. However, based on the Pretrial Order and the email cited above, it is also clear that plaintiffs believed that jurisdiction was not in dispute. In fact, from the email chain, it is clear that plaintiffs planned on presenting evidence on the question of jurisdiction, but elected not to based on defendant's contention that "[s]tanding is not an issue at trial." Defendant is also correct that jurisdiction can be challenged at any time, and that a different standard of proof is required to establish standing at various stages of

7

litigation (as the Court set forth above).  However, as the *Lujan* court noted, whether or not the issue of standing is controverted is relevant for what level of proof is required at trial. *See Lujan*, 504 U.S. at 561 ("And at the final stage, those facts **(if controverted)** must be supported adequately by the evidence adduced at trial.") (emphasis added, internal citations and quotations omitted).

The Court finds that, given defense counsel's statement that "[s]tanding is not an issue at trial," coupled with the parties' agreed Pretrial Order, which presents no issues on the question of standing, it would be entirely prejudicial to plaintiffs for the Court to preclude plaintiffs from presenting evidence of standing at this stage, evidence the plaintiffs initially planned to present before they were dissuaded by defendant.  In this instance, the Court will reopen evidence to the extent that the Court accepts the previously filed affidavits of Mr. Stratford and Mr. Proios [Docs. 1-2, 1-3] as if they were presented at trial.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971) (holding that the decision to reopen a bench trial is addressed to the Court's sound discretion) (citations omitted).  To the extent that defendant may argue he would be prejudiced by the Court relying on the affidavits previously submitted in this case, the Court finds that any prejudice defendant might face would be outweighed by the prejudice plaintiffs would face if the case were dismissed for lack of evidence regarding standing.

The Court finds that the evidence presented by these stipulations is sufficient to establish Article III standing in this case.  Both declarations are sworn under penalty of

perjury and make clear that Mr. Stratford and Mr. Proios have recreational and aesthetic interest in Cherokee Lake, as they frequently go boating, Mr. Stratford goes birdwatching, and Mr. Proios lives on its shore and frequently collects water samples [Docs. 1-2, 1-3]. Furthermore, Mr. Stratford and Mr. Proios have alleged that defendant's actions have caused them concrete and particularized harms.

The declarations aver that Mr. Stratford's and Mr. Proios's above-mentioned recreational and aesthetic interests in the lake are harmed by defendant's activities: namely defendant's failure to provide 3.268 wetland acres and the resulting loss of ecosystem services they would have otherwise enjoyed, defendant's uncovering of pyritic rock which harms the ecosystem health of Cherokee Lake and their enjoyment of it, and defendant's deed restriction which leaves the declarants feeling insecure that the site will continue to provide the ecosystem benefits it was meant to ensure [Docs. 1-2, 1-3]. The Court finds that there is sufficient evidence of record to establish the ecological connection between the mitigation site and Cherokee Lake, as well as the fact that preservation of wetlands supports the ecological health of the connecting waterways around the mitigation site. Accordingly, the Court finds that with the now admitted sworn testimony represented by the two affidavits, there is sufficient evidence in the trial record to establish Article III standing.

In reaching this decision, the Court notes that it ultimately rules in favor of the defendant on the merits. Fully reopening the evidence to present live testimony which would be duplicative of the affidavits would be a waste of the time and resources of the

9

parties, as well as the judicial resources of the Court, and would not change the ultimate outcome of this matter.[2]

## III. Outstanding Objection

Prior to trial, plaintiffs objected to the admission of Defendant's Exhibits Nos. 14 (slides 2-5 only), 15, 16, and 17 [Doc. 64]. Plaintiffs also raised the same objection during trial. As grounds, plaintiffs argued that these exhibits relate to the issue of the deed restriction, which the Court previously ruled "appears to present purely legal questions" [Doc. 54 at p. 19]. As a purely legal question, plaintiffs argued that it would be improper to present evidence on the issue. The Court deferred ruling and admitted the evidence in question subject to a final ruling on the objection.

While the Court did previously rule that issues relating to the deed restriction appear to present questions of law, after further consideration of the issue, in conjunction with the evidence presented, the Court finds that the evidence in question does present relevant factual evidence which informs the Court's application of the law. Specifically, the Court finds that the exhibits in question explain what role TDEC played in the development and approval of the land use restriction at issue in this case, which is relevant to the Court's application of the law. Accordingly, plaintiffs' objections [Doc. 64 and objections made during trial] are **OVERRULED**. Having resolved the outstanding preliminary issues, the Court now presents its findings of fact and conclusions of law.

---

[2] The Court limits this ruling to the specific facts of this case. Future litigants would be prudent to ensure that the question of jurisdiction has either previously been fully addressed by the Court or to present the evidence at trial needed to support jurisdiction.

## IV.    Findings of Fact[3]

1.    In the early 1990s TDOT undertook steps to widen certain sections of State Routes 1 and 32 in Grainger County, Tennessee (the "Project").  As part of this process, TDOT determined that it would need to fill in approximately 0.92 acres of wetlands, located at Briar Fork Branch Mile 1.5, north of Briar Fork Embayment of Cherokee Lake, which then filtered tributary waters flowing into Cherokee Lake [Def. Exs. 1 and 3].

2.    On September 6, 1994, the ACOE issued a Clean Water Act § 404 Permit to TDOT [Def. Ex. 1].

3.    On August 9, 1994, TDOT was granted a Clean Water Act § 401 Certification of its § 404 Permit by the Tennessee Department of Environment and Conservation ("TDEC") pursuant to its delegated authority under § 401 of the Clean Water Act  ("CWA"), 33 U.S.C. § 1341, which included various conditions and restrictions that the Project must meet [Def. Ex. 4].

4.    The parties stipulate that "[t]he original CWA § 401 Certification TDOT obtained from TDEC required TDOT to create at least three acres of wetland to compensate for filling an existing wetland for a road work project" [Doc. 63 at ¶ 8(a)].  This was one of the conditions required by the Certification [Def. Ex. 4 at p. 4, ¶ 11].

5.    The Certification also contained a requirement that "A total of 3.0 acre will be indentured into a declaration of restriction which will become an attachment to the deed

---

[3]  The Court only makes the findings of fact necessary to reach its conclusions of law. Furthermore, as all issues related to the ACOE's Permit were resolved prior to trial, the Court focuses primarily on the Certification, not the Permit.

11

and run with the property," defined as "an attachment to a deed to protect, in perpetuity, the aesthetic, educational, or ecological values" of the created wetlands [Def. Ex. 4 at p. 4, ¶ 11].

6.  The Certification also required TDOT to "monitor the created wetland and guarantee its success," with "success" defined as "being able to delineate the wetland as a jurisdictional wetland by the best available technique," as well as to prevent violations of state water quality criteria [Def. Ex. 4 at p. 5, ¶ 13 and p. 5].

7.  By letter dated September 25, 1996, TDOT notified TDEC that the wetland mitigation area was not meeting stipulated goals. TDOT proposed a revised mitigation plan to increase wetland creation at the site from 3.0 acres to 3.268 acres [Def. Ex. 5].

8.  By letter dated July 15, 1997, TDOT notified TDEC that pyritic material was discovered underlying the mitigation site, and that any further attempt to expand the mitigation site would result in the exposure of the pyritic material, which would release acidic and iron laden material into Briar Fork Creek. Because of the discovery of the pyritic material, TDOT requested that the 1.01 acres of then created wetland mitigation area be counted as sufficient to satisfy the requirements of the Certification, which originally required the creation of 3.0 acres of wetland. The letter also sought a one-year extension to complete road work [Def. Ex. 6].

9.  By letter dated August 28, 1997, Mike Lee, an employee of TDEC involved in the approval of the Certification and any modifications, sent TDOT a letter responding to TDOT's July 15, 1997, letter. Mr. Lee's letter does not directly state that TDOT's

12

request of a reduction of the Certification's 3.0 mitigation area requirement to accept the then created 1.01 acres was approved. Instead, the letter states, in pertinent part, "[i]n regards to the wetland mitigation, the Division has decided that TDOT shall remove the inflow/outflow pipe at the downstream end of the mitigation site. In addition, TDOT shall investigate and, if feasible, convey flow from the conveyance on the western property line . . . into the wetland mitigation site. Monitoring of the site shall continue as required." The letter does directly approve the request for a one-year extension of road work construction [Def. Ex. 8].

10.     At trial, Mr. Lee testified that he modified the Certification to accept the 1.01 created wetland mitigation area as sufficient no net loss of resource value for the .092 wetland loss. Mr. Lee stated that his August 28, 1997, letter both approved the modification of the Certification to reduce the 3.0 acres of required wetland mitigation to the 1.01 acres of already created wetland mitigation, as well as adding the additional requests specifically spelled out in the letter [Transcript Vol.1, Doc. 76, pp. 197-198].

11.     Mr. Lee confirmed on cross-examination that the August 28, 1997 letter does not specifically state that the request for a reduction of the wetland mitigation requirement was approved, but that it was his intention that the letter act as an approval [Transcript Vol. 2, Doc. 77, pp. 32-33].

12.     Mr. Lee testified that his approval of the modification to reduce the Certification's wetland mitigation requirement to 1.01 acres was premised in part on his finding that there was no net loss in wetland resource value. He testified that he had the

13

authority to make the modification under those circumstances [Transcript Vol. 2, Doc. 77, pp. 19-20].

13.    Mr. Lee testified that the pH level of the water found in an area, standing alone, does not preclude classification of that area as a wetland.  Mr. Lee noted that the cranberry bogs of Johnson County, TN, which he described as "highly important wetlands," have a pH level of 3 [Transcript Vol. 1, Doc. 76, pp. 204-205].

14.    Mr. Lee testified that open water areas can be included as wetlands for the purposes of the creation of wetland mitigation.  Mr. Lee described a variety of factors which are considered when deciding whether something constitutes a wetland, but stated that he did visit the site in question after litigation was filed, and that during his visit he and his colleagues catalogued 78 different species in the area, of which approximately 80 percent were hydrophytic.  In concluding that the site qualified as a wetland, Mr. Lee summarized that even though there was a section that consisted of open water, that the area still had vegetation in some parts, substrate in others, and "it's classified as a wetland type" [Transcript Vol 1, Doc. 76, pp. 198-202].

15.    Mr. Lee's site report, from his August 17, 2015, site visit, indicates that he found a rare, threatened orchid (Planthera flava var. herbiola) in the area, which qualified the site as an "exceptional Tennessee Waters" [Def. Ex. 30 at p. 7].  The report also details the procedures followed and the findings he made from his visit to the area [Def. Ex. 30].

16.    Mr. Lee testified that "to my knowledge, no construction activity above the wetland mitigation site, so how could there be this issue going into the wetland mitigation

14

site? Again, my knowledge is everything's flowing downstream" [Transcript Vol. 2, Doc. 77, p. 79].

17.     The parties stipulate that "[i]n 1997, TDOT ended wetland creation at the mitigation site after creating 1.01 wetland acres" [Doc. 63 at ¶ 8(b)].

18.     Todd Hughes, a professional geologist, made an independent evaluation of the geologic natural conditions of the wetland mitigation area. Mr. Hughes opined that the natural bedrock underlying the area of the road construction project at issue (including the mitigation site) is part of the Chattanooga Shale Formation, which is known to contain pyrite. Mr. Hughes further opined that if TDOT had further expanded the wetland mitigation site they would run the risk of striking bedrock and exposing the shale [Transcript Vol 1, Doc. 76, p. 178-186 and Def. Ex. 11].

19.     Mr. Hughes explained that the Chattanooga Shale Formation contains pyrite, also known as iron sulfide. He explained that when iron sulfide is exposed to water, such as rainwater, the iron sulfide oxidizes, releasing sulfuric acid. Mr. Hughes confirmed that the existence of pyritic material is a naturally occurring condition in the environment [Transcript Vol. 1, Doc. 76, pp. 186-187].

20.     Mr. Hughes testified that he visited the area in question multiple times, at least three times, for several hours each visit. While visiting the location, Mr. Hughes inspected both the land inside the wetland mitigation area, as well the surrounding area, which contained tributaries flowing into the mitigation site. During his site visits, Mr. Hughes observed signs of pyritic material in the tributaries flowing into the mitigation

15

site, specifically "staining that would indicate oxidation of pyrite." Mr. Hughes confirmed that the existence of the pyritic material in the tributaries flowing into the mitigation site was a naturally occurring condition [Transcript Vol. 1, Doc. 76, pp. 187-188].

21. On cross-examination, Mr. Hughes did not know if the pyritic material he observed was exposed because of human activity, did not know if the water in the area was acidic before TDOT began work on the site in question, but did state that "there is Chattanooga shale in the drainage basin there, so the streams, the rain water, you know, certainly runs over Chattanooga shale; but I have no way of knowing what it was like before they built the wetland" [Transcript Vol. 1, Doc. 76, pp. 189-191].

22. Jeff Duke, an environmental consultant with a Master's in Aquatic Ecology from the University of Alabama, acting as a defense expert, testified that he visited the site in question multiple times, including visits in 2011, 2014, 2015, and 2019 [Transcript Vol. 2, Doc. 77, pp. 83-84].

23. Mr. Duke testified that when determining whether an area qualifies as a wetland, one must look at multiple factors, such as examining the soil, the hydrology, and what types of plants are present. He stated that the existence of a pond (open water) does not preclude a finding of wetland, but instead you consider whether the pond has obligate plants, how deep the water is, as well as taking into account that water depth in the area will vary over the course of the year, with water tending to be deeper in wetland areas during winter and spring, and the area tending to dry up in the summer and fall [Transcript Vol. 2, Doc. 77, pp. 91-92].

16

24.     Mr. Duke testified that the pH level of a wetland can vary greatly, even over the course of the same day.  Mr. Duke described several natural factors which can affect the pH level of water, noting that pH tends to be lower in the morning, but tends to increase after the sun rises because of photosynthesis of the plant life.  If there has been recent rainfall, that can also affect pH, as can temperature [Transcript Vol. 2, Doc. 77, pp. 93-94].

25.     Mr. Duke testified that his measurements of the size of the wetland mitigation area were in excess of the stipulated amount of 1.01 wetland acres, with his most recent calculations, in 2019, measuring 2.11 acres of wetland mitigation [Transcript Vol. 2, Doc. 77, pp. 98-100].

26.     Mr. Duke testified that on February 3rd and 4th of 2014, he visited the area for approximately four hours each day and took pH readings both in the mitigation area as well as upstream of the construction site and mitigation site.  Sample 7, taken from a stream flowing into a wetland which was not attached to the mitigation site had a pH of 3.86.  The stream in question was upstream of the highway construction area and, to Mr. Duke's knowledge, had no construction associated with it [Transcript Vol. 2, Doc. 77, pp. 104-105].

27.     Mr. Duke's expert report states that the pH readings taken within the wetland mitigation site on February 3, 2014, ranged from 5.73 to 5.91, but the readings were taken after a "rain event."  The February 4, 2014, readings ranged from 6.11 to 6.22 [Def. Ex. 13 at p. 8].

17

28. Mr. Duke took additional pH readings on July 16, 2015, and May 7, 2019, again both in the mitigation area and in areas upstream. The 2015 pH readings within the mitigation area were 4.37 and 4.84, while the upstream readings ranged from 4.93 through 4.98. The 2019 pH reading within the mitigation area was 6.55, while the upstream readings ranged from 4.82 through 5.74 [Def. Ex. 13 at pp. 8-11].

29. Mr. Duke described the geographical relationship between the wetland mitigation area and the area where the road construction was taking place. He testified that the wetland mitigation site is upstream of the road construction area, such that any runoff from the road construction site could not have flowed into the wetland mitigation site, but rather would have flowed into areas which are downstream of the wetland mitigation site [Transcript Vol. 2, Doc. 77, pp. 105].

30. On cross-examination, Mr. Duke elaborated that the pyrite encapsulation sites (areas where pyritic material excavated during road construction was stored and later buried) was approximately half a mile downhill of the wetland mitigation area. Thus, it would be physically impossible for runoff from the road construction site, which might have been tainted by pyritic material excavated during the construction, to flow into the mitigation site because water does not flow uphill [Transcript Vol 2, Doc. 77, pp. 127-128].

31. The report of plaintiffs' expert, Barry Sulkin, states that he performed a site visit to the wetland mitigation area on February 2, 2006, and found acidic pH levels within the mitigation area, including readings of 3.4 and 5.4 [Def. Ex. 19 at p. 5].

18

32. Mr. Sulkin visited the mitigation area again on November 7, 2013, and found pH values in and around the mitigation area ranging from 5.31 to 6.12. [Def. Ex. 19 at pp. 5-6].

33. On rebuttal, Mr. Sulkin testified that, other than the pH level of the water and the acreage of wetland mitigation actually created, he agreed that the land in the mitigation area counted as a wetland, calling the area a "good wetland" [Transcript Vol. 3, Doc. 78, p. 7].

34. The sworn declaration of E. Joseph Sanders, who served as TDEC's General Counsel during the time period at issue in this litigation, establishes that TDEC both helped to create the template for the Notice of Land Use Restriction, and approved the actual Notice of Land Use Restriction at issue in this case as being in compliance with the Certification [Def. Ex. 17 at ¶ 6].

35. Mr. Sanders's declaration elaborates that the Notice of Land Use Restriction at issue in this case served as the model for TDEC's current template on Land Use Restrictions, and that the current version is substantially similar to the version at issue in this case [Def. Ex. 17 at ¶ 6].

V.    **Conclusions of Law**

A.    **Collateral Attack of the Certification**

1. In the Order [Doc. 36] ruling on defendant's motion to dismiss, the Court held that the CWA does not provide a private cause of action against regulators for violating procedural regulations. *Askins v. Ohio Dept. of Agriculture*, 809 F.3d 868, 874,

19

876 (6th Cir. 2016). Rather, the citizen-suit provision of the CWA is meant to provide a private cause of action against persons allegedly in violation of an effluent standard or limitation. 33 U.S.C. § 1365(a). This does not include the ability to sue persons for alleged violations based on the underlying premise that their certifications or permits were modified in a procedurally invalid way.

2. That same Order [Doc. 36] noted that this Court has previously not allowed plaintiffs to sue defendants that were complying with state permits whose underlying legality was questioned. *See Nat'l Parks Conservation Ass'n, Inc., v. Tennessee Valley Authority*, 175 F.Supp.2d 1071, 1078 ("[I]t is clear that plaintiff is not alleging that [defendant] violated any of the terms of the TDEC permits, but rather is attacking the legality of the permits issued by the Tennessee state enforcement agency. As such, plaintiff's lawsuit is in effect a collateral attack on a facially valid permit issued by the state enforcement agency.").

3. The Order [Doc. 36] explained that the instant case differs from National Parks *Conservation Ass'n*, because not only are plaintiffs alleging that the modifications to the Certification were invalid, but they also allege that, under all possible iterations of the § 401 Certification — the original version, the modified version as-according-to-plaintiffs, and the modified version as-according-to-defendant — defendant is in violation of the Certification's terms and conditions.

4. The Order [Doc. 36] held that to the extent that the parties disagree about the processes and procedures that TDEC took to modify defendant's Certification, those claims

20

cannot be brought under the citizen-suit provision of the CWA. However, to the extent that the parties disagree, not about the processes or procedures, but about the resulting terms of those modifications, the Court will evaluate those claims to the extent that they allege violations of defendant's § 401 certification, as § 1365 provides a cause of action for this claim.

5.    That ruling remains in place. In their post-trial brief, plaintiffs made several collateral attacks against the process and procedures TDEC followed with respect to the Certification and its modification, including, but not limited to: challenging the authority of Mr. Lee to modify the Certification; the form and language (or lack of language) TDEC, through Mr. Lee, used to authorize the Certification modification; whether public notice was required and/or given for the various actions taken with respect to the Certification; whether TDEC used the proper regulations and procedures with respect to the Certification and its modification; and the form and language of the Notice of Land Use Restriction (which was created and approved by TDEC). Such collateral attacks of the Certification are not allowed under the citizen-suit provision of the CWA, and plaintiffs' claims along these lines are statutorily barred.

**B.    Certification's Wetland Mitigation Requirement**

6.    Plaintiffs contend that the defendant violated the Certification by failing to meet the Certification's wetland mitigation requirement.

7.    Generally, the interpretation of a legal document is a matter of law for the Court to decide. *See United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2013) (citing

*Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)). To interpret the certification, the Court will use "the same principles of interpretation that apply to contracts and other legal documents." *Sierra Club v. Louisville Gas & Elec. Co.*, No. 3:14-cv-391, 2015 WL 5105216, at *4 (W.D. Ky. Aug. 31, 2015) (citing *Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194, 1204–05 (9th Cir. 2013)); *see also Deschutes River All. v. Portland Gen. Elec. Co.*, 331 F. Supp. 3d 1187, 1198 (D. Or. 2018) ("The Court interprets the Certification 'like any other contract.'" (quoting *NRDC*, 725 F.3d at 1204)); *Tenn. Clean Water Network v. Tenn. Valley Auth.*, 905 F.3d 436, 446 (6th Cir. 2018) (citing *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 269 (4th Cir. 2001)) (interpreting multiple provisions of a Clean Water Act National Pollutant Discharge Elimination System permit issued by the Environmental Protection Agency using principles of contract interpretation).

8. Accordingly, if the language of the certification "is plain and capable of legal construction, the language alone must determine the [certification]'s meaning." *Piney Run Ass'n*, 268 F.3d at 270. If, however, language of the certification is ambiguous, the Court will consider extrinsic evidence in interpreting its terms. *Id.* "When there is ambiguity in a permit, courts may look to extrinsic evidence 'to determine the intent of the permitting authority.'" *Louisville Gas & Elec.*, 2015 WL 5105216, at *5 (quoting *NRDC*, 725 F.3d at 1207).

9. The Court finds that a § 401 certification is a form of TDEC regulation. *See Louisville Gas & Elec.*, 2015 WL 5105216, at *5 (finding that a NPDES permit was a form

22

of regulation). When interpreting an agency regulation, courts will generally give deference to an agency's interpretation of its own regulations. *Auer v. Robbins*, 519 U.S. 452, 461–62 (1997). *Auer* deference is "undoubtedly inappropriate, [however], where the agency's interpretation is 'plainly erroneous or inconsistent with the regulation,'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quoting *id*. at 461), or "when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Id*. (quoting *Auer*, 519 U.S. at 462); *see also Kentucky Waterways All. V. Johnson*, 540 F.3d 466, 474–75 (6th Cir. 2008). The latter situation arises when it appears that the interpretation is nothing more than a "convenient litigating position or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." *Christopher*, 567 U.S. at 155 (citations omitted).

10.     The Court, in its Order ruling on summary judgment, declined, at that time, to grant *Auer* deference to Mr. Lee's interpretation of the August 28, 1997 letter [Doc. 54 pp. 14-15]. Instead, the Court held that "the question of the intent of the letter with respect to the acreage requirement, which greatly depends on the reliability and credibility of Mr. Lee's later-in-time declarations, is a factual issue to be resolved at trial" [Doc. 54 p. 15].

11.     Having had the opportunity to observe Mr. Lee's testimony at trial on this issue, the Court finds Mr. Lee's testimony credible, and accepts his explanation that the August 28, 1997 letter was intended to serve as an approval of TDOT's request to modify

23

the Certification's wetland mitigation acreage requirement to 1.01 acres.  *See* Findings of Facts ¶¶ 10-11.

12.     Plaintiffs argue that the various litigation positions taken by TDOT and TDEC in this matter are contradictory, and call into question Mr. Lee's credibility. Plaintiffs point to TDEC's letter dated February 14, 2014, which acknowledges that TDOT only created 1.01 acres of wetland, but goes on to explain that TDEC exercised its enforcement discretion not to enforce the Certification's wetland mitigation requirement [Pltf. Ex. 4 at p. 2].  However, there is no indication that Mr. Lee was consulted in the drafting of the February 14, 2014, letter.  Nor is there any question that Mr. Lee's August 28, 1997 letter fails to specifically state that the modification of the Certification was approved, which the author of the February 14, 2014, letter presumably recognized. Now that the matter is in litigation, the ambiguity of the August 28, 1997 letter allows for the introduction of extrinsic evidence to interpret the letter's intent, as the Court discussed above.  And having considered that evidence, and observed Mr. Lee at trial, the Court found his testimony credible.  Accordingly, the Court rejects plaintiffs' arguments.

13.     Defendant obtained the Certification, as required by 33 U.S.C. § 1341(a)(1). The § 401 Certification initially required TDOT to create 3.0 acres of mitigation wetland in place of the wetland filled in by road construction [Def. Exs. 3 and 4].

14.     "[U]pon request by the permittee or, as a result of reevaluation of the circumstances and conditions of a permit, the district engineer may determine that the public interest requires a modification of the terms and conditions of the permit . . ."

24

33 C.F.R. § 325.7(b). TDOT requested a modification of the Certification to reduce the wetland mitigation requirement to 1.01 acres based on the discovery of pyritic material within the mitigation site. TDEC, acting through Mr. Lee, approved the requested modification, accepting the 1.01 acres of wetland mitigation created by TDOT to make up for the 0.9 acre of wetland lost to road construction. *See* Findings of Fact ¶¶ 10 – 12.

15.     Tennessee regulations allow the Commissioner to authorize a permit modification without public notice if that modification will not materially change water quality aspects of the project or will result in an improvement of water quality. Tenn. Comp. R. & Regs. 1200-4-7-.04(4)(a)(3).[4] The regulations also impose a "no net loss" requirement, meaning that the Commissioner cannot authorize § 401 certifications unless any lost resource value associated with the project is offset by some sort of mitigation sufficient to result in no net loss of resource value. Tenn. Comp. R. & Regs. 1200-4-7-.04(6)(c).[5] In this instance, there was no net loss because of the 1.01 acres of created wetland mitigation offset the 0.9 acres of wetland area lost to road construction. *See* Findings of Fact ¶ 12.

16.     Thus, the Court finds as a matter of law that the Certification was modified to reduce the wetland mitigation requirement to 1.01 acres of wetland mitigation. The Court further finds as a matter of law that TDEC complied with that requirement by creating 1.01 acres of wetland mitigation. *See* Findings of Fact ¶ 17.

--------

[4]     This regulation was later renumbered to Tenn. Comp. R & Regs. 0400-40-07-.04(4)(a)(3).

[5]     This regulation was later renumbered to Tenn. Comp. R & Regs. 0400-40-07-.04(6)(c).

17.    To the extent that plaintiffs argue that TDEC failed to follow proper procedures or regulations in the modification of the Certification, the Court holds as a matter of law that such arguments are a collateral attack on the certification process which is not authorized under the citizen-suit provision of the CWA.

### C.    pH Level of the Water

18.    Plaintiffs contend that the acidity of the water found in the wetland mitigation area is such that the wetlands fail to meet Tennessee's water quality standards, as required by the Certification.

19.    Tennessee regulations governing water quality require that wetlands have a pH level in the range of 6.5 to 9.0 and streams have a pH level of 6.0 to 9.0.  Tenn. Comp. R & Regs. 0400-40-03-.03(3)(b).[6]

20.    Tennessee regulations also provide that "[w]here naturally formed conditions (e.g. geologic formations) or background water quality conditions are substantial impediments to attainment of the water quality standards, these natural or background conditions shall be taken into consideration in establishing any effluent limitations or restriction on discharges to such waters."  Tenn. Comp. R & Regs. 0400-40-03-.05(7).

21.    The regulations further state that "[f]or purposes of water quality assessment, with the exception of pathogens, exceedances of water quality standards caused by natural

---

[6]   As the alleged water quality violation is an ongoing condition, and the Certification merely requires compliance with Tennessee's water quality standards, which have evolved over time, as opposed to some specific pH criteria, the Court looks to the current version of the water quality regulations for guidance.

26

conditions will not be considered the condition of pollution impairment. Examples of natural conditions include alterations caused by beaver activity, non-construction related rockslides of pyritic materials, and groundwater with naturally elevated metals or low dissolved oxygen levels." Tenn. Comp. R & Regs. 0400-40-03-.05(7).

22.     The testimony at trial established that the area around the mitigation area rests on the Chattanooga Shale Formation, which is known to contain pyritic material that can lower the pH of water.  Mr. Hughes observed signs of pyritic material in the tributaries flowing into the mitigation site, specifically "staining that would indicate oxidation of pyrite."  Mr. Hughes confirmed that the existence of the pyritic material in the tributaries flowing into the mitigation site was a naturally occurring condition.  *See* Findings of Fact ¶¶ 18 – 20.

23.     The testimony established that it would have been impossible for runoff from the construction project to contaminate the mitigation area, because the mitigation area is uphill from road construction project and water does not run uphill.  See Findings of Fact ¶¶ 29-30.

24.     Based on the above, the Court finds as a matter of law that the acidic pH level of the water in and around the wetland mitigation site is caused by a naturally occurring condition, and thus is excepted from the 6.5 to 9.0 water quality standard for wetlands and the 6.0 to 9.0 standard for streams.  Accordingly, the Court finds as a matter of law that

TDOT is not in violation of the pH water quality standards, and thus not in violation of a condition of the Certification.

### D. Notice of Land Use Restrictions

25. Plaintiffs contend that the language used in the deed restriction imposed by the Notice of Land Use Restrictions applicable to the wetland mitigation area does not comply with the Certification and TDEC regulations.

26. The evidence before the Court established that TDEC both helped to create the Notice of Land Use Restriction and approved the final document, including the language used in the document, and that the Notice of Land Use Restriction at issue in the case served as the model for TDEC's current template on Land Use Restrictions. *See* Findings of Fact ¶¶ 34, 35.

27. Accordingly, the Court finds as a matter of law that the Notice of Land Use Restriction complies with the Certification.

28. To the extent that plaintiffs challenge the process and procedures TDEC used in creating and approving the Notice of Land Use Restriction, or the language contained in the same, the Court holds as a matter of law that such arguments are a collateral attack on the certification process which is not authorized under the citizen-suit provision of the CWA.

## VI. Conclusion

Plaintiffs' objection [Doc. 64] is **OVERRULED**. Furthermore, based on the findings of fact and conclusions of law as stated above, the Court **FINDS** in favor of

defendant on all claims.  Accordingly, the Court will **DISMISS** plaintiffs' claims and will

**DIRECT** the Clerk of the Court to **CLOSE** this case.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE